IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| SARAH SAVINSKY, | ) | Case No. 3:19-CV-1767 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOICLA SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.    Introduction

Plaintiff, Sarah Savinsky, seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).  Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Savinsky's applicaitons for DIB and SSI be AFFIRMED.

## II.    Procedural History

On July 15, 2016, Savinsky applied for DIB and SSI.  (Tr. 233-45).[1]  Savinsky alleged that she became disabled on March 18, 2015, due to "neuropathy, scoliosis, bulging disc, sciatica, stroke, [and] depression."  (Tr. 91-92).  The Social Security Administration denied

---

[1] The administrative transcript appears in ECF Doc. 10.

Savinsky's applications initially and upon reconsideration. (Tr. 91-154).  Savinsky requested an administrative hearing.  (Tr. 170-71, 174-76).  ALJ Matthew Winfrey heard Savinsky's case on November 8, 2018 and denied the claims in February 12, 2019 decision.  (Tr. 29-50, 59-90).  On June 3, 2019, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-7).  On August 5, 2019, Savinsky filed a complaint to obtain judicial review of the Commissioner's decision.  ECF Doc. 1.

## III.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Savinsky was born on March 12, 1990, and she was 25 years old on the alleged onset date.  (Tr. 233).  Savinsky had a high school education and completed two years of college.  (Tr. 42, 261).  Savinsky had previous work experience as a crew member at Taco Bell, crew trainer at McDonalds, and shift manager at KFC, of which the latter two were classified as skilled, medium work.  (Tr. 66-68, 83, 301).

### B.    Relevant Medical Evidence

On March 18, 2015, Savinsky went to the emergency department due to back and leg pain.  (Tr. 465).  A CT scan of Savinsky's lumbar spine showed mild dextroconves scoliosis, no acute fracture or spondylolisthesis, minimal sclerosis of the apophyseal joints at L4-L5 and L5-S1, mild circumferential bulge at L4-L5 and L5-S1, and no focal disc protrusion or herniation.  (Tr. 399-401, 468).  Examination showed no decreased range of motion, ecchymosis, erythema, swelling, edema, or circulation issues.  (Tr. 466).  Zena Jalloh, MD, determined that Savinsky had degenerative disc disease, prescribed Ultram, and discharged her in stable condition.  (Tr. 465-66).

On April 7, 2015, Savinsky saw Nagah Elarossi, MD, for a follow-up related to her emergency department visit.  (Tr. 461).  Dr. Elarossi noted that Savinsky continued to have leg weakness and referred her to neurology and neurosurgery consultations.  (461, 463).

On May 16,2015, Savinsky again went to the emergency department due to pain radiating down her legs, a worsening left foot drop, and difficulty ambulating.  (Tr. 561, 846).  On examination, Lauren Southerland, MD, noted normal range of motion and no joint swelling, edema, or tenderness; however, Savinsky had weakness and numbness in her leg.  (Tr. 561, 563, 846, 848).  Dr. Southerland admitted Savinsky to the hospital for further observation because she was concerned about nerve compression.  (Tr. 563).  Neurosurgeon Andrew Look, MD, evaluated Savinsky later the same day, noting that she had an altered gait due to an inability to lift her feet and diminished sensation in her legs below the knees.  (Tr. 484, 564, 849).  Dr. Look noted that Savinsky's gait was relatively steady and she was able to ambulate without assistance, but she was unable to stand on her toes/heels bilaterally.  (Tr. 486, 566, 852).  Based on an MRI of Savinsky's spine, Dr. Look determined that her spine was unremarkable and referred her for a neurology consultation.  (Tr. 486, 566, 852).

On May 17, 2015, Brendan Kelley, MD, and Zahra Sadat-Hossieny, MD, conducted a neurology consultation.  (Tr. 487-88, 491, 494, 852-56, 861).  Dr. Kelley and Dr. Sadat-Hossieny determined that Savinsky had peripheral neuropathy based on significant sensory loss in her legs up to her knees, decreased muscle bulk, and weakness.  (Tr. 487).  Dr. Kelley and Dr. Sadat-Hossieny determined that Savinsky would benefit from ankle-foot orthotics ("AFOs") and referred her to physical therapy for assessment.  (Tr. 488, 556).

On May 18, 2015, Stephanie Bissonnette, DO, and Adam Quick, MD, discharged Savinsky from the hospital.  (Tr. 543-44, 557-58, 842-44).  Dr. Bissonnette and Dr. Quick noted that Savinsky had no sensation below her ankle and an altered gait due to an inability to lift her

feet.  (Tr. 543, 557, 843).  Nevertheless, they determined that Savinsky was able to ambulate independently and was stable for treatment as an outpatient.  (Tr. 544, 558, 842).  At a follow-up on October 28, 2015, Dr. Quick noted that Savinsky had continued weakness in her leg, radiating pain, diminished sensation, an altered gait, bilateral foot drop, and steppage gait.  (Tr. 864).

On July 7, 2015, Kristin Aguado, NP, noted that Savinsky reported sharp pain in her ankles and feet, poor circulation in her legs, numbness in her knees down, and occasional tingling.  (Tr. 545).  Savinsky also had trouble making her physical therapy appointments due to difficulty with transportation and taking care of her child.  (Tr. 545).  On examination, nurse Aguado noted no edema, but Savinsky had "slight swelling" and bruising in her left leg.  (Tr. 547).

From April 14 through July 19, 2016, Savinsky attended five physical therapy sessions.  (Tr. 342-43, 439-48).  At the intake session, Kelly Wheeler, PT, noted that Savinsky had a "good" potential for rehabilitation.  (Tr. 446).  Savinsky had impaired gait, joint integrity/mobility, and posture.  (Tr. 446).  Savinsky said that lying down and walking alleviated her pain but standing and sitting aggravated it.  (Tr. 446).  Savinsky said she needed to lean against a solid object when she stood to cook.  (Tr. 446).  On May 11, 2016, Wheeler noted that Savinsky had shown improvements in strength and stability, and that she would ask Savinsky's doctor to prescribe bilateral AFOs.  (Tr. 443).  On July 7, 2016, Michelle Robson, PT, noted that Savinsky was not compliant with her AFOs.  (Tr. 342).  Savinsky was able to sit without support for more than 30 seconds, had fair standing, and was able to walk 150 feet with or without an assistive device.  (Tr. 342, 347)  Savinsky discontinued physical therapy on July 19, 2016, because she was leaving town.  (Tr. 442).  Wheeler noted that Savinsky had a good understanding of her home exercise program and would continue it.  (Tr. 441).

On July 6, 2016, Savinsky was admitted to the hospital with concerns that she had a possible stroke.  (Tr. 330-36).  Paul Steven Robinson, MD, noted on musculoskeletal examination that Savinsky had no back pain, no edema, and no tenderness.  (Tr. 331-32, 428).  Alex Perchuk, MD, conducted follow-up evaluations on July 7 and 8, 2016, and found that Savinsky was in no acute physical distress and had normal range of motion in her extremities.  (Tr. 336, 338, 348).  Dr. Perchuk referred Savinsky to physical therapy.  (Tr. 336, 338, 348).

On July 29, 2016, Dr. Perchuk noted that Savinsky had done well since her discharge from the hospital, but she continued to have chronic peripheral neuropathy and a bilateral foot drop.  (Tr. 692).  On examination, Savinsky had normal passive range of motion, was able to rise from a sitting position unassisted, had a neuropathic gait pattern characterized by steppage, and was very unsteady when standing upright.  (Tr. 693-94).  Dr. Perchuk referred Savinsky to Timothy Rust, MD, for evaluation and an orthotist to be fit for AFOs.  (Tr. 694).

On August 15, 2016, Craig Blue, LO, evaluated Savinsky for orthotics and molded two custom AFOs to treat her bilateral foot drop.  (Tr. 877-78, 962).  On October 13, 2016, Blue delivered the AFOs, checked to ensure they were properly made and fit Savinsky, and gave Savinsky extra foam liners for her calf.  (Tr. 959, 1315).  Savinsky demonstrated improved balance and was able to stand still without an assistive device.  (Tr. 959, 1315).  At a follow-up on November 1, 2016, Dr. Perchuk noted that Savinsky showed improved gait and mobility after getting her AFOs.  (Tr. 696).

Between September 20 and November 14, 2016, Savinsky attended nine physical therapy sessions.  (Tr. 887-91, 901, 916-18, 925-27, 938-41, 949-51, 967-69, 977-80, 985-88, 993-95, 1281-83, 1294-97, 1306-08, 1315-17, 1320-22, 1332-35, 1339-42, 1347-49).  At the initial session, Erica Cromwell, PT, noted that Savinsky had not yet received her AFOs, but she was able to sit in a high-backed chair with her back and feet supported and she could ambulate

5

without an assistive device.  (Tr. 888, 890).  Throughout Savinsky's physical therapy sessions, she showed improvement in leg strength, was able to perform increasing repetitions of sit-to-stand exercises and squats and worked on correcting her posture.  (Tr. 901, 918, 926-27, 939, 941, 950, 969, 978, 986, 1282-83, 1295, 1297, 1306 1322, 1332, 1340).  After she received her AFOs, Savinsky told Heather Davis, PTA, that she had a noticeable difference in independence in performing daily living activities and Davis noted "significant improvements" in Savinsky's stability.  (Tr. 901).  Davis also warned Savinsky to monitor her AFOs for skin irritation.  (Tr. 970, 1323).  On November 14, 2016, Savinsky told Cromwell that she wanted to discontinue physical therapy for three weeks while she worked on her home exercise plan.  (Tr. 995, 1349). Cromwell noted that Savinsky had met all her long-term goals and shown "significant improvements in functional strength, balance, and gait endurance/speed."  (Tr. 995, 1349).  At the three-week follow-up, Cromwell noted that Savinsky showed no regression, was able to ambulate for 1,000 feet, could ascend/descend a full flight of stairs independently, and could transfer independently.  (Tr. 1000, 1354).

On October 11, 2016, Savinsky told her chemical dependency counselor that she "didn't have much pain in her legs, even after physical therapy.  She takes care of herself after therapy by taking a nap with her son and relaxing."  (Tr. 688).

On December 5, 2016, Savinsky saw Don McIntire, Ph.D., for a mental health functioning evaluation for the Division of Disability Determination.  (Tr. 739).  Although the evaluation primarily focused on Savinsky's mental impairments, Dr. McIntire recorded some of Savinsky's comments and made some of his own observations regarding Savinsky's physical condition.  (Tr. 739-48).  Dr. McIntire noted that Savinsky had peripheral neuropathy affecting her feet and legs and drop-foot in both of her feet, which required braces.  (Tr. 742).  Savinsky reported that she had difficulty balancing because she could not feel her feet.  (Tr. 742).  Dr.

McIntire observed that Savinsky's gross motor abilities appeared good and she walked in a well-coordinated gait.  (Tr. 743).  Savinsky also told Dr. McIntire that she spent most of her time sitting with her son.  (Tr. 745).

On December 9, 2016, Matthew Reichardt, COA, COF, adjusted Savinsky's AFOs.  (Tr. 1008, 1362).  Reichardt rolled back the edges of Savinsky's AFOs "to provide a more total contact fit to present friction at the base of the heel" and rolled out the edge at the tibial crest.  (Tr. 1008, 1362).  Savinsky said that she was happy with the adjustments.  (Tr. 1008, 1362).

On April 16, 2017, Savinsky went to the emergency department because she had a wound on her heel, which had become malodorous and had some drainage after two months without treatment.  (Tr. 1013).  Savinsky said she padded her AFOs with an extra sock and cleaned her wounds with peroxide.  (Tr. 1013).  She denied any swelling.  (Tr. 1013).  On examination, Alaina Swartziander, CNP, noted that Savinsky showed no necrosis, erythema, or edema, but there was a malodorous ulcer with scant serous drainage.  (Tr. 1046, 1369).  Swartziander referred Savinsky to a podiatrist for further evaluation, treatment, and debridement.  (Tr. 1048, 1371).  Swartziander also told Savinsky to "take every opportunity to keep pressure off the heel especially at night[,] to keep her foot propped up with a pillow[,] and have her heel hanging off the edge."  (Tr. 1048, 1371).

On April 25, 2017, Savinsky saw Reichardt for another adjustment of her AFOs.  (Tr. 1408-09).  Reichardt added a Velcro strap to the back of the left AFO because they were rubbing on her heel incorrectly.  (Tr. 1409).  Savinsky was happy with the adjustment.  (Tr. 1409).  Reichardt added another Velcro strap to Savinsky's right AFO on June 23, 2017.  (Tr. 1413).

On May 3, 2017, Dr. Perchuk noted that Savinsky was independent in her activities of daily living and had a normal passive range of motion with bilateral AFOs in place.  (Tr. 794-95).  Dr. Perchuk also noted that Savinsky was able to rise from a sitting position without

assistance and had a normal gait with her AFOs.  (Tr. 796).  On March 7, 2018, Dr. Perchuk

noted that Savinsky's neuropathy pain was adequately controlled with medications, she was

independent in her daily living activities, and she had a normal gait with her AFOs.  (Tr. 763-64,

801-02).  Savinsky was again able to rise from a sitting position unassisted.  (Tr. 764, 802).

On June 5, 2017, Savinsky saw Timothy Rust, MD.  (Tr. 774-79).  Dr. Rust determined

that Savinsky's peripheral neuropathy symptoms were most consistent with Charcot-Marie-

Tooth disease.  (Tr. 774).  Dr. Rust noted that Savinsky's AFOs caused abrasions and sores on

her legs and feet, and he advised Savinsky to have her AFOs checked at a local shop.  (Tr. 774-

75).  Further, Dr. Rust stated that Savinsky was able to sit comfortably during her examination.

(Tr. 777).  At a follow-up on October 9, 2017, Savinsky told Dr. Rust that her AFOs were "life

changing, [and that she] can walk the dog and play with her child."  (Tr. 781, 1126).  She still

had abrasions and sores from her AFOs.  (Tr. 1126).  On February 26, 2018, Dr. Rust did not

note any abrasions or sores, but noted that Savinsky still wore her AFOs and was able to sit

comfortably.  (Tr. 788, 791).

On August 10, 2017, Savinsky went to the emergency room with bilateral foot wounds on

the surfaces of her toes.  (Tr. 1453, 1527).  Savinsky said she had numbness in both feet and did

not realize the wounds were forming at first.  (Tr. 1453, 1527).  On examination, Matthew Lyle

Nyholm, MD, noted that Savinsky had normal range of motion, no edema, normal capillary

refill, and no areas of induration or fluctuance, but she had ulcerated dorsal surfaces on her first

toes with a fat layer exposed.  (Tr. 1455, 1529).  She had absent sensation in her feet and soft

tissue swelling.  (Tr. 1455, 1529).  Dr. Nyholm diagnosed Savinsky with a foot ulcer and mild

cellulitis, and he referred her to a podiatrist.  (Tr. 1457, 1540).  Further, Dr. Nyholm gave

Savinsky a pamphlet on cellulitis, which in relevant part directed her to "prop up the infected

area on pillows to reduce pain and swelling. Try to keep the area above the level of your heart as often as you can." (Tr. 1485, 1559).

On April 12, 2018, Savinsky saw William Tabbert, DPM, for treatment of her foot ulcers. (Tr. 773). Dr. Tabbert noted that Savinsky's AFOs had rubbed ulcers into both of her heels, and he performed debridement to reduce risk of infection and improve healing. (Tr. 773). Dr. Tabbert dressed the wounds and instructed Savinsky on how to dress her wounds. (Tr. 773). On May 1, 2018, Dr. Tabbert noted that Savinsky's ulcers progressed to hyperkeratotic lesions with some maceration. (Tr. 771). He again treated and dressed the wounds. (Tr. 771). On May 29, 2018, Dr. Tabbert treated an infection in Savinsky's right toe. (Tr. 769). He noted that there was no erythema, drainage, or odor. (Tr. 769). Savinsky again went to Dr. Tabbert on June 12, 2018, with an ulcer on her left toe. (Tr. 768). Dr. Tabbert noted that Savinsky had new lesions on the back of her legs due to rubbing from the buckle on her AFO straps. (Tr. 768). Dr. Tabbert changed the position of the AFO strap buckle to prevent future imprints and prescribed clindamycin because her feet had erythema and a mild odor. (Tr. 768). On June 26, 2018, Savinsky had a partial thickness wound on her lower right leg, but the ulcers on the back of her legs had resolved and she had no evidence of infection or abnormality. (Tr. 810).

On April 16, 2018, Blue recommended that Savinsky get replacement AFOs because her old ones had degraded due to normal wear and tear. (Tr. 1497-98). Blue replaced the Velcro straps on Savinsky's AFOs and spent two hours repairing them. (Tr. 1572). On May 10, 2018, Blue evaluated, measured, fit, and delivered new AFOs for Savinsky. (Tr. 1576). On June 27, 2018, Reichardt replaced all the Velcro on Savinsky's AFOs, and Savinsky indicated that she was happy with the adjustment. (Tr. 1508, 1583).

### C.  Relevant Opinion Evidence

#### 1.  Treating Physician – Timothy Rust, MD

On August 17, 2018, a "general physical impairments" form was completed, purportedly by Dr. Rust.[2]  (Tr. 1587-88).  In relevant part, the form indicated that Savinsky could sit for up to 4 hours at a time and up to 8 hours in a workday.  (Tr. 1587).  One line-item on the form asked the frequency with which Savinsky would "[n]eed to elevate legs during [an] 8-hour workday," but none of the options – "none, occasionally, frequently, most of the time" – were circled.  (Tr. 1588).  The form indicated that Savinsky was not prescribed any assistive devices, would never be off-task due to her impairments, and would be absent from work "[a]bout one day per month" due to her impairments or treatment.  (Tr. 1588).  The form also stated that Savinsky could not work on her feet because she had "distal lower extremity weakness due to neuropathy."  (Tr. 1588).

#### 2.  Treating Physician – Alex Perchuk, MD

On May 8, 2018, Dr. Perchuk wrote a letter, stating:

> Please Excuse Sarah N. Savinsky from work.  Ms. Savinsky has a history of cryptogenic left MCA stroke and congenital neuropathy.  It is my medical opinion that Sarah Savinsky should not return to work at this time.

(Tr. 1590).  The letter did not assess any specific functional impairments.  (Tr. 1590).

#### 3.  State Agency Consultants

On November 16, 2016, state agency consultant Angela Bucci, DO, assessed Savinsky's physical capacity based on a review of her medical records.  (Tr. 99-102, 105).  Dr. Bucci determined that Savinsky could lift up to 20 pounds occasionally and 10 pounds frequently,

---

[2] It is not clear that Dr. Rust actually completed the form.  Although Dr. Rust's name appears on the signature line, whoever completed the form also wrote upon it that "Dr. Rust does not complete FCEs." (Tr. 1587-88).

stand and/or walk for up to 6 hours in an 8-hour workday, and sit for up to 6 hours in an eight-hour workday.  (Tr. 100).  Savinsky could not push or pull with her lower extremities due to her AFOs, but she had a normal gait.  (Tr. 100).  Savinsky could occasionally climb ramps and stairs, kneel, crouch, crawl; frequently balance and stoop; and never climb ladders, ropes, or scaffolds. (Tr. 100).  She was limited to no unprotected heights while using her AFOs and needed to "[a]void all exposure" to hazards.  (Tr. 100-01).  Based on her assessment of Savinsky's functional capacity, Dr. Bucci concluded that Savinsky was capable of performing a range of light work.  (Tr. 105).  On March 20, 2017, Yeshwanth Bekal, MD, concurred with Dr. Bucci's opinion, except that Dr. Bekal found that Savinsky could frequently kneel, crouch, and crawl. (Tr. 132-34, 137).

### D.     Relevant Testimonial Evidence

Savinsky testified at the ALJ hearing.  (Tr. 65-82).  Savinsky testified that her driver's license was suspended and that she either took the bus or got a ride from her friend to get around. (Tr. 66).  Savinsky said that she went grocery shopping once or twice a month, but she had trouble pushing the cart if there were many groceries in it and had trouble walking for a long period of time.  (Tr. 71).  Savinsky had some trouble with self-care caused mostly by her depression.  (Tr. 71).  In a typical day, Savinsky did dishes and "sometimes" cooked dinner.  (Tr. 74).  Mopping and vacuuming bothered her back.  (Tr. 74).  She did laundry, but had trouble folding it due to her hand impairments.  (Tr. 75).  Savinsky also had a child she cared for and a dog that she fed and let outside.  (Tr. 66, 75-76).  On at least one occasion, Savinsky walked around in a creek without shoes, which caused her to cut up her feet and get an infection.  (Tr. 77).

Savinsky testified that she could not work because she had trouble walking, getting around, and being on her feet.  (Tr. 69).  She said that she could not "lift things hardly at all."

(Tr. 69).  Savinsky said that her braces helped with her drop foot, but they rubbed the back of her

legs and her heels, creating raw spots.  (Tr. 69).  Savinsky said that she saw Dr. Rust for her

nerve pain and that a Dr. Quick, at Ohio State, told her she would be in a wheelchair eventually.

(Tr. 69-70).  She said she could stand for "maybe 30 minutes," and she had trouble carrying as

much as a gallon of milk.  (Tr. 70).  Savinsky said that she was kicked out of physical therapy

after she got her AFO braces because her insurance would no longer cover it.  (Tr. 74).  She said

she could sit for up to 45 minutes without propping her legs up, and that she had to prop her legs

up because her feet would swell causing them to not fit into her braces.  (Tr. 70, 78).  She usually

propped her legs up for over half the day.  (Tr. 79).  When the ALJ asked why she propped her

legs up, Savinsky said:

> They swell up really bad and don't fit in my braces right.  And it helps with the
> circulation.  I'm scared that the stroke was caused from having bad circulation in
> my legs, and that's where the blood clot came from.

(Tr. 82).

Brian Lee Walmer, a vocational expert ("VE"), also testified at the hearing.  (Tr. 83-89).

The ALJ asked the VE whether a hypothetical individual with Savinsky's age, education, and

experience could work if she were:

> limited to work at the sedentary exertional range, with the following additional
> limitations.  The individual can only occasionally climb ramps and stairs, never
> climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch,
> crawl; occasionally fee; no exposure to workplace hazards such as unprotected
> heights or dangerous moving mechanical parts.  The individual is limited to work
> that is not at a production rate pace, such as no assembly line work.  The
> individual's duties would not include conflict resolution or evaluating or
> persuading anyone.  Nor more than occasional interaction with supervisors,
> coworkers, and the public.  And can tolerate occasional changes in the workplace.

(Tr. 83-84).  The VE testified, among other things, that such an individual could not perform any

of Savinsky's previous jobs, but could perform unskilled, sedentary jobs such as a polishing

machine operator, sorting machine operator, and wire insulator.  Savinsky's attorney asked the

VE if work would be available to the hypothetical individual described by the ALJ if she "would need to be able to prop [her] legs at waist-level while seated . . . [for] 50 percent of the workday."  (Tr. 87).  The VE testified that such a limitation would rule out all work.  (Tr. 87). The VE testified that leg-propping at waist level would be treated as time-off-task for unskilled, sedentary work, so employers would tolerate leg-propping for no more than 10 percent of the workday.  (Tr. 88).

## IV.    The ALJ's Decision

The ALJ's February 15, 2019, decision found that Savinsky was not disabled and denied her claims for DIB and SSI.  (Tr. 32-44).  The ALJ found that Savinsky had the severe impairments of: "hereditary peripheral neuropathy (Charcot-Marie-Tooth disease); status post stroke; depression and anxiety."  (Tr. 34).  The ALJ also determined that none of Savinsky's impairments, singly or in combination, met or medically equaled a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 35-37).

The ALJ determined that Savinsky had the RFC to perform a range of sedentary work, except that she could:

> occasionally balance, stoop, kneel, crouch, crawl and climb ramps and stairs; never climb ladders, ropes, scaffolds; frequent feeling, handling and fingering [*sic*][3]; no exposure to workplace hazards such as unprotected heights or dangerous moving mechanical parts; limited to simple, routine tasks, not at a production rate pace, such as no assembly line work; duties would not include conflict resolution or evaluating or persuading anyone; occasional interaction with supervisors, coworkers, and the public and can tolerate occasional changes in the workplace.

(Tr. 37).  In evaluating Savinsky's RFC, the ALJ expressly stated that he "considered all symptoms" in light of the medical and other evidence.  (Tr. 37).

---

[3] I assume the ALJ actually meant "frequently feel, handle and finger."

13

The ALJ discussed Savinsky's hearing testimony, noting that "she developed drop foot" in 2015 and reported that she was unable "to work due primarily to having difficulty walking and foot pain and numbness."  (Tr. 38).  In reviewing the evidence related to Savinsky's foot and walking problems, the ALJ stated that:

> [Savinsky wore] braces on her lower extremities to help with foot drop, though they rub areas on her feet and legs, developing sore spots.  She reports not walking very far at all, essentially staying at home unless she has to go to an appointment.  She feels she could stand maybe 30 minutes at a time, though reported she is unable to lift her son who weighs about 30 pounds and she also reports trouble carrying a gallon of milk.  She described problems sitting, estimating about a 45 minute tolerance, noting that she has to prop her feet up as they swell due to her braces not fitting right.
>
> * * *
>
> While the claimant does have bilateral foot drop, as well as graded sensory loss in the upper and lower extremities and some sign of lower extremity atrophy, she has preserved reflexes.  She does demonstrate significantly reduced strength in plantar flexion and dorsiflexion.  Yet, she wears bilateral **ankle/foot orthotics** (AFO) and it is noted throughout the record that the claimant is able to rise from a seated position unassisted and demonstrates an essentially normal gait when wearing them.  Furthermore, she gets them adjusted, repaired or replaced as needed, with good result and she reports being happy with the outcomes, at times calling the braces *"life-changing,"* nevertheless at times she has needed intermittent treatment for acute sores.
>
> * * *
>
> [Savinsky] has not generally received the type of medical treatment one would expect for a totally disabled individual.  Although the claimant has received treatment for the allegedly disabling impairments, that treatment has been essentially routine and conservative in nature, with the exception of the recommendation of bilateral AFOs, which offered functional improvement.  Moreover, it is notable that while the claimant reported being *"kicked out"* of physical therapy due to her AFOs, the record documents that when she participated in physical therapy, she received benefit as evidence by reported pain reduction, functional strength, balance, and gait endurance/speed.

(Tr. 38-39) (internal citations omitted) (emphasis in original).  Based on his review of Savinsky's testimony and the other evidence in the record, the ALJ determined that Savinsky's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but her

14

"statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence."  (Tr. 38, 41).

In reviewing the medical opinion evidence, the ALJ gave "little weight" to Dr. Rust's opinion, Dr. Perchuk's opinion, and the state agency consultants' opinions.  (Tr. 40-41).  The ALJ explained that much of Dr. Rust's opinion was inconsistent with the record, which showed that: (1) Savinsky did well when wearing AFOs despite having lower-extremity issues; (2) Dr. Rust did not prescribe any assistive devices, which would be expected if Savinsky were unable to stand; and (3) Dr. Rust had seen Savinsky only three times over a year, but had not seen her for the 6 months prior to filling out the opinion form.  (Tr. 40).  Nevertheless, the ALJ found that Dr. Rust's opinion that Savinsky "cannot work on her feet" was consistent with evidence in the record and limited her RFC to sedentary work with additional postural limitations on that basis.  (Tr. 40).  The ALJ explained that Dr. Perchuk's opinion was discounted because it did not provide a detailed function-by-function analysis, it opined only on topics reserved for the Commissioner (whether Savinsky was able to work), and it was inconsistent with objective medical evidence such as Dr. Perchuk's own notes indicating that Savinsky had a normal gait with AFOs, adequately-controlled pain, and good functional status.  (Tr. 40).  Regarding the state agency consultants, the ALJ gave the state agency consultants' opinions little weight because the record evidence supported *greater* limitations than they found – *i.e.*, sedentary work.  (Tr. 41).

Because Savinsky lacked the ability to perform all or substantially all of the requirements of sedentary work, the ALJ relied on testimony from the VE to determine whether Savinsky would be able to perform any work in the national economy.  (Tr. 442-43).  Based on the VE's testimony, the ALJ found that someone with Savinsky's age, experience, and RFC could "perform the requirements of representative occupations in the unskilled sedentary occupational base such as: polishing machine operator; sorting machine operator; and wire insulator."  (Tr. 43)

15

(citations omitted).  In light of his findings, the ALJ determined that Savinsky was not disabled from March 18, 2015, through the date of his decision and denied the claims for DIB and SSI. (Tr. 43-44).

## V.      Law & Analysis

### A.      Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion.  *Rogers*, 486 F.3d at 241; *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("Substantial evidence supports a decision if 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' backs it up." (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971))).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion.  42 U.S.C. §§ 405(g), 1383(c)(3); *see also Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."); *Biestek*, 880 F.3d at 783 ("It is not our role to try the case *de novo*." (quotation omitted)).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting Sarchet v. Charter, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national

17

economy.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that he is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a), 416.912(a).

### B.    RFC – Leg-Propping Limitation

Savinsky argues that the ALJ did not adequately explain why he rejected her testimony that she needed to proper her legs while sitting, or why he did not include such a limitation in his RFC finding.  ECF Doc. 11 at 11-12.  Savinsky notes that:

> The ALJ did consider many of Ms. Savinsky's statements, including those pertaining to difficulty walking and picking up items, her use of AFO braces, and her personal estimations of her abilities to sit, stand, and lift.  Tr. 37-38.  He evaluated each of these statements against the medical evidence in the record.  Tr. 38.

ECF Doc. 11 at 11.  Nevertheless, Savinsky asserts that the ALJ's "only reference" to her "need to prop her legs was the statement that she had testified that 'she has to prop her feet up as they swell due to her braces not fitting right.'"  ECF Doc. 11 at 11 (quoting (Tr. 38)).  Savinsky contends that the ALJ's statement was incorrect because she had actually "testified that she props her legs to prevent swelling so that her braces would fit correctly."  ECF Doc. 11 at 12.  Further, Savinsky argues that the ALJ's decision did not explain his assessment of Savinsky's credibility regarding her need to prop her legs at waist level while seated.  ECF Doc. 11 at 12.  Savinsky asserts that the ALJ's failure to include such an explanation created a lack of clarity regarding whether the ALJ actually rejected the limitation or merely forgot to include it in the RFC finding.  ECF Doc. 11 at 12.  Further, Savinsky argues that the ALJ's error was not harmless because the VE "testified that an individual who would need to prop [her] legs while sitting at [her]

workstation would not be able to perform any jobs that exist in significant numbers in the national economy." ECF Doc. 11 at 12.

The Commissioner responds that "the ALJ appropriately considered the relevant objective medical and opinion evidence" and "properly evaluated [Savinsky's] subjective symptoms" in assessing her RFC, and that Savinsky has "fail[ed] to demonstrate any error by the ALJ." ECF Doc. 13 at 5, 8.  The Commissioner argues that, even though "[t]he ALJ was under no obligation to discuss [Savinsky's] claim that she needed to elevate her legs," the ALJ "explicitly acknowledge[d]" the alleged limitation and concluded that it was unsupported by the evidence as a whole. ECF Doc. 13 at 11.  Further, the Commissioner asserts that the ALJ's decision not to include a leg-propping limitation was supported by substantial evidence, including: (1) records indicating that Savinsky had a normal gait and improved ability to walk when using AFO braces; (2) treatment notes indicating improvement in pain reduction, strength, balance, and gait with physical therapy; (3) the lack of any medical opinion indicating a need for leg propping; (4) Dr. Rust's opinion indicating that Savinsky *did not* need to raise her legs during an 8-hour work day; (5) examination notes and diagnostic imaging showing only minor abnormalities, normal range of motion, and "some" to "absent" pain in her back; and (6) Savinsky's ability to perform daily living activities, including caring for a young child, household chores, preparing meals, handling finances, shopping, using public transportation, driving, and caring for a dog. ECF Doc. 13 at 6, 10-11. And the Commissioner asserts that the ALJ discussed countervailing evidence, such as Savinsky's testimony that: (1) she experienced consistent foot pain and numbness aggravated by standing, sitting, and carrying objects; and (2) she had to occasionally get her AFO braces adjusted due to sores and wear-and-tear. ECF Doc. 13 at 6, 9.  But the ALJ also noted that Savinsky "consistently reported being happy with the outcome of adjustments and noted her AFOs were 'life changing.'" ECF Doc. 13 at 6.

19

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an assessment of a claimant's ability to do work despite her impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

In *Sorrell v. Comm'r of Soc. Sec.*, the Sixth Circuit held that an ALJ was not required to include in his RFC finding a limitation that a claimant was required to elevate her legs. 656 F. App'x 162, 170 (6th Cir. 2016). The Sixth Circuit explained that "[i]t [was] clear from the record that the ALJ considered [the claimant's leg] swelling and the need for her to elevate her legs." *Id.* Further, although "some treatment records mentioned leg elevation as a treatment for edema, no physician indicated that [the claimant's] edema caused work-related functional limitations, and no medical expert opined that [the claimant] would need to elevate her feet to waist level during the workday or even every day." *Id.* Moreover, the claimant's own testimony indicated that her leg swelling was intermittent and that her medication helped reduce swelling. *Id.* We have a nearly identical fact pattern in this case, and the same result is required.

The ALJ followed proper legal standards in deciding not to include a leg-propping limitation in Savinsky's RFC. 42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241. The ALJ complied with the regulations by considering *all* of Savinsky's impairments in light of the medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e); SSR 96-8p, 1996 SSR LEXIS 5. In doing so, the ALJ expressly and exhaustively discussed Savinsky's leg problems –

20

including her testimony that she had to prop her feet up when she sat and evidence that her AFOs caused sores, ulcers, and swelling in her legs.  (Tr. 38-39).  Further, the ALJ was not required to accept Savinsky's subjective complaints, but properly discounted them because her complaints regarding the intensity, persistence, and limiting effects of her symptoms were inconsistent with the medical and other evidence in the record.  (Tr. 38, 41); *Jones .v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003); SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017) ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence.").  Thus, the ALJ followed proper legal standards in evaluating Savinsky's RFC and in declining to include a leg-propping limitation.

Substantial evidence also supported the ALJ's decision to not include a leg-propping limitation in Savinsky's RFC.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241; *Biestek*, 880 F.3d at 783.  The medical evidence shows that two separate treatment providers on two separate occasions instructed Savinsky to prop or elevate her legs to treat acute episodes of ulcers and cellulitis caused by rubbing from her AFOs.  (Tr. 1048, 1371, 1485, 1559).  But no medical records, including the treatment records in which providers instructed Savinsky to prop her leg, indicated that she would need to continue propping her leg after her ulcers and cellulitis resolved.  *See generally* (Tr. 1048, 1371, 1453-85, 1527-59).  And the only medical opinion form that included an option for the provider to indicate that Savinsky was required to prop her legs *did not* indicate that such a limitation was necessary.  (Tr. 1588).  Further, medical evidence indicates that Savinsky's ulcers resolved after she was fitted for new AFOs in May 2018 and had them adjusted with new Velcro strapping in June 2018.[4]  (Tr. 810) (no ulcers or infection on June

---

[4] Arguably, because Savinsky first reported her foot/leg ulcers in August 2017 and they were resolved by June 2018, *see* (Tr. 810, 1453, 1528), the need to prop her legs as a result of those ulcers was not an

26, 2018); (Tr. 1508, 1576, 1583) (new AFOs and adjustment).  Thus, in the absence of any

evidence that a physician specifically indicated that Savinsky would need to continue propping

her legs for an extended period of time and that such leg-propping would need to occur during

the workday or even every day, the ALJ was neither required to include a leg-propping limitation

in the RFC nor give it any extensive discussion in his decision.  *Sorrell*, 656 F. App'x at 170.

Moreover, other evidence indicated that Savinsky's description of her leg symptoms and need to

elevate her legs was inconsistent with the medical record, including: (1) treatment notes that

consistently found no swelling, edema, or erythema and a generally normal range of motion/gait

with AFOs; (2) that she was able to sit comfortably and rise from a seated position during her

treatment sessions; (3) physical therapy notes which indicated that Savinsky successfully met all

of her physical therapy goals and was able to perform exercises, such as sit-to-stands and squats;

and (4) records that showed Savinsky was able to walk relatively normally with her AFOs. (Tr.

331-32, 336, 338, 342, 347-48, 428, 441, 443, 446, 488, 547, 556, 561, 563, 696, 743, 745, 763-

64, 777, 781, 788, 791, 794-96, 802, 846, 848, 887-91, 901, 916-18, 925-27, 938-41, 949-51,

967-69, 977-80, 993-95, 1000, 1046, 1126, 1281-83, 1294-97, 1306-08, 1315-17, 1320-22, 1332-

35, 1339-42, 1347-49, 1354, 1369, 1455, 1529).

     In sum, a review of the record and ALJ's written decision leads me to find that the ALJ's

decision not to include a leg-propping limitation in the RFC was reasonably drawn from the

evidence in the record and made pursuant to proper legal standards.  42 U.S.C. §§ 405(g),

1383(c)(3); *Rogers*, 486 F.3d at 241.  Thus, the ALJ's RFC finding and subsequent conclusion

that Savinsky was not disabled fell within the Commissioner's "zone of choice," and this court

---

impairment that lasted for the required 12 months.  *See* 42 U.S.C. § 1382c(a)(3)(A) (to be disabled a
claimant's impairment must have lasted "for a continuous period of not less than twelve months"); *Combs
v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006) ("Claimants with impairments of insufficient
duration are not disabled." (citing 20 C.F.R. § 404.1520(a)(4)(ii))).

may not second-guess it – even if we might have reached a different conclusion if considering the evidence in the record in the first instance.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241; *Biestek*, 880 F.3d at 783, *Mullen*, 800 F.3d at 545.

## VI.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Savinsky's applicaitons for DIB and SSI be AFFIRMED.


Dated: May 8, 2020

Thomas M. Parker
United States Magistrate Judge

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).